# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ARLEEN K. WEYLAND,

        **Plaintiff,**

        **v.**                        **Case No. 19-CV-1531**

ANDREW M. SAUL,
Commissioner of the Social Security Administration,

        **Defendant.**

## DECISION AND ORDER

### 1. Introduction

Plaintiff Arleen Weyland alleges she has been disabled since January 1, 2016. (Tr. 13.) She seeks disability insurance benefits and supplemental security income. After her application was denied initially (Tr. 80-91) and upon reconsideration (Tr. 93-108), a hearing was held before an administrative law judge (ALJ) on July 12, 2018 (Tr. 33-79). During the hearing Weyland amended her alleged onset date to August 1, 2016. (Tr. 13.) On October 4, 2018, the ALJ issued a written decision, concluding that Weyland was not disabled. (Tr. 13-26.) After the Appeals Council denied Weyland's request for review on

August 19, 2019 (Tr. 1-4), she filed this action. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 3, 6), and the matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ found that Weyland "has not engaged in substantial gainful activity since August 1, 2016, the amended alleged onset date[.]" (Tr. 16.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). The ALJ concluded that Weyland has the following severe impairments: "diabetes mellitus with diabetic neuropathy of the lower extremities, fibromyalgia, and obesity[.]" (Tr. 16.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational

Case 1:19-cv-01531-WED   Filed 10/02/20   Page 2 of 26   Document 18

requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e). The ALJ found that Weyland "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 19.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. § 404.1545(a)(1). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1545(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Weyland has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except with the following limitations: [Weyland] is able to frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently, but not constantly, reach in all directions with bilateral upper extremities; occasionally use foot controls with her bilateral lower extremities; and frequently balance and stoop. Further, the claimant must avoid more than frequent exposure to work-related extreme cold, such as that experienced in a commercial freezer, work-related vibration, such as that experienced during the use of a jackhammer or similar tool, and hazards, such as unprotected heights and unguarded moving machinery.

(Tr. 20.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560. Weyland's past relevant work was as "a Hand Packager […], Warehouse Worker […], and Machine Operator[.]" (Tr. 24.) The ALJ concluded that Weyland was "unable to perform her past relevant work." (Tr. 24.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c). At this step the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Weyland] can perform[.]" (Tr. 24.) In reaching that conclusion the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of Weyland's age, education, and work experience could perform the requirements of occupations such as Cafeteria Attendant, Cleaner, and Folder. (Tr. 25.) After finding that Weyland could perform work in the national economy, the ALJ concluded that she was not disabled. (Tr. 24-26.)

### 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such

4

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). If the ALJ committed a material error of law, however, the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## 4. Analysis

Weyland argues that the ALJ erred by (1) using the incorrect standard to analyze symptom severity; (2) reaching unsupportable conclusions relating to symptom severity when considering exam findings, daily activities, allegedly conservative treatment, and noncompliance with treatment; (3) improperly limiting the weight of medical opinions; and (4) not accounting for her need for standing and walking limitations in the RFC assessment.

5

### 4.1. Weyland's Subjective Symptoms

An ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work related activities…." SSR 16-3p. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p.

The ALJ must also consider, to the extent they are relevant, the following factors:

1.　　Daily activities;
2.　　The location, duration, frequency, and intensity of pain or other symptoms;
3.　　Factors that precipitate and aggravate the symptoms;
4.　　The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5.　　Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p.

The ALJ stated: "While the medical record established that [Weyland] had severe impairments, [her] generally normal musculoskeletal and neurological findings and her relatively limited treatment suggested that the effects of her diabetic neuropathy, fibromyalgia, and obesity were relatively mild and that her physical work-related abilities were significantly intact." (Tr. 17.)

Weyland argues that the ALJ failed to assess her subjective allegations in accord with SSR 16-3p. (ECF No. 13 at 10.) She contends the ALJ used improper and inconsistent standards to evaluate her allegations; failed to explain how the exam findings were inconsistent with her allegations; improperly concluded that her daily activities suggest the ability to perform a range of light work; improperly determined that she received conservative treatment; and failed to consider reasons for her noncompliance with treatment.

### 4.1.1. Symptom Evaluation Standard § 404.1529(a)

Weyland contends that the ALJ applied an incorrect legal standard when he found that Weyland's "allegations concerning the intensity, persistence, and limiting effects of those symptoms are *not fully supported* in light of her generally normal musculoskeletal

and neurological findings, relatively limited treatment, and reported activities[.]" (Tr. 22.) (Emphasis added.) She states that the correct inquiry is whether the allegations "can *reasonably be accepted as consistent* with the objective medical evidence and other evidence." (ECF No. 13 at 11 (quoting § 404.1529(a).) (Emphasis in original.)

In response, the Commissioner argues that the ALJ used the correct standard because he also wrote that her impairments were not "generally consistent" with the record. (ECF No. 16 at 8.) The Commissioner further argues that, even if the ALJ used the incorrect standard, the error was harmless because he "otherwise points to information that justifies his credibility determination." (*Id.* (quoting *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013)).)

The ALJ used inconsistent standards for evaluating Weyland's subjective symptoms, finding at different times that her symptoms were both "not fully supported in light of" and "inconsistent with" "her generally normal musculoskeletal and neurological findings, relatively limited treatment, and reported activities." (Tr. 21, 22.) Only the second phrase is an accurate recitation of the standard. *See* 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.").

The incorrect standard referenced by the ALJ appears to be a more rigorous standard. *See, e.g., Minger v. Berryhill*, 307 F. Supp. 3d 865, 871-72 (N.D. Ill. 2018)

(remanding where ALJ used the "not entirely consistent" standard). Because it is impossible to determine which of the two standards the ALJ actually applied, the ALJ failed to build an accurate and logical bridge between the evidence and his subjective-symptom evaluation.

The ALJ offered other explanations for discounting the severity of Weyland's subjective symptoms. However, because the ALJ recited two legal standards, the court cannot be sure which one he used to evaluate the limiting effects of Weyland's symptoms. If the ALJ applied the wrong standard, it may have materially affected his decision. Here, the ALJ's potential application of an incorrect legal standard was a mistake of law that necessitates remand.

### 4.1.2.  Exam Findings

The ALJ "must consider whether an individual's statements… are consistent with the medical signs and laboratory findings of record." (SSR 16-3p(1).) Weyland argues that the ALJ did not build a logical bridge between his determination of "generally normal musculoskeletal and neurological findings" and his finding that Weyland's subjective symptoms were inconsistent with the objective medical evidence. (ECF No. 13 at 17-18.)

In response, the Commissioner argues that the ALJ did build a logical bridge because the court "can reasonably follow the path of the ALJ's thinking." (ECF No. 16 at 13.) He argues that the ALJ could conclude that "the normal findings 'trumped' the

abnormal ones" because no medical opinion stated Weyland's abnormal signs were particularly serious.  (*Id.*)

The ALJ repeatedly relied on "generally normal musculoskeletal and neurological findings." The ALJ's assessment stated:

> Since August 2016, [Weyland] had positive examination findings, but they were inconsistent and limited. *She demonstrated inconsistent signs of "mild" pain behavior and abnormal reflexes and reduced sensation in her legs or feet and she presented with an antalgic gait during just two examinations.* Her musculoskeletal and neurological findings were otherwise normal, including that her gait was often normal or unremarkable. She had multiple normal diabetic foot examinations as well.

(Tr. 17) (emphasis added). Weyland argues that the ALJ did not "provide accurate and logical support for finding an inconsistency with Weyland's allegations" and therefore did not "build a logical bridge between the objective evidence and his conclusion." (ECF No. 13 at 17.)

The ALJ provided string citations to support his finding of "generally normal musculoskeletal and neurological findings." The citations contain evidence of both normal and abnormal findings. Although he cited to certain pages in the medical record, he did not discuss the findings on those pages. The following medical records are the specific pages the ALJ cited in support of his finding of "generally normal musculoskeletal and neurological findings."

On September 23, 2016, Dr. Toni Jo Neal, Weyland's treating physician and doctor of podiatric medicine and surgery, noted several subjective reports of pain and

Case 1:19-cv-01531-WED   Filed 10/02/20   Page 10 of 26   Document 18

ambulatory issues (e.g., "painful left ankle [for two] weeks," "pain in both feet that keeps her up at night," "some days are very hard to even walk"). (Tr. 447.) Dr. Neal noted Weyland is "in no apparent distress," had "joint pain, [g]eneralized arthritis, [f]ibromyalgia," neurologically experienced "[n]umbness/[t]]ingling, [d]iabetic [n]europathy, sharp pain in feet." (Tr. 448.) Weyland had "muscle strength and tone and range of motion of upper and lower extremities within normal limits, [and] no joint swelling." (Tr. 448.) She had "[d]iminished muscle strength to all prime movers of the foot and ankle [and r]ange of motion for all joints from the ankle distal with deconditioning reduction[.] (Tr. 449.) Weyland had "no tremor or evidence of seizures[;] [n]o neuropathy or allodynia." (Tr. 448.) When discussing a neurological pinpoint diabetic foot exam, Dr. Neal noted "[a]chilles and patellar reflexes are slowed and weaker." (Tr. 449.) The treatment plan included left foot strapping to "help control biomechanical abnormalities." (Tr. 449.)

On October 4, 2016, Dr. Rose Dotson, Weyland's treating physician in neurology, noted she had an antalgic gait and "no significant arthritic changes in the hip. There are mild arthritic changes within the pubis." (Tr. 483, 487.) The assessment included "painful diabetic neuropathy; some recent worsening of pain," "neuropathic pain," and, for fibromyalgia, "clinical indication of widespread pain with central sensitization." (Tr. 478.) The assessment included "painful diabetic neuropathy; some recent worsening of pain," "neuropathic pain," and, for fibromyalgia, "clinical indication of widespread pain

with central sensitization." (Tr. 478.) On February 7, 2017, Dr. Dotson found Weyland had "no pain behavior" and that she "[m]oves all four limbs equally," with "[n]o tremor, dystonia or dyskinesia" and no loss of "bulk[,] tone[,] and strength [in] all limbs." (Tr. 649.) Weyland's gait was antalgic and "mildly unsteady with tandem." (Tr. 649.)

On October 13, 2016, Nurse practitioner Christine Arendt found Weyland had "[n]o edema," "[n]o [c]alf tenderness," and "mild vibration loss" and found her neuropathy to be "present" and "stable." (Tr. 627, 633.) On February 16, 2017, Arendt noted Weyland had "[d]iabetic neuropathy[:] present, stable." (Tr. 622.)

On March 6, 2017, Dr. Melanie Rohloff, Weyland's primary care provider, noted Weyland reported "worsening burning foot pain" which is "severe" and that she "continues also though to have multiple joint and muscle pain elsewhere." (Tr. 791.) On physical exam Dr. Rohloff found "symmetrical musculature, no edema, no gross joint swelling or deformity." (Tr. 793.) Weyland's "deep tendon reflexes are normal and symmetric in the upper and lower extremities. Gait and station are normal, no gross motor or sensory deficits." (Tr. 793.) On January 1, 2018, Dr. Rohloff noted Weyland "[c]ontinues to have all over pain" and "quit working due to pain." (Tr. 759-60.)

On September 13, 2016 nurse practitioner Roxanne Radich met with Weyland for diabetes management. (Tr. 722.) She noted Weyland's "[f]eet and legs always hurt" and had "[n]o discoloration or decreased sensation." (Tr. 725.) Radich also met with Weyland

for diabetes management on September 8, 2017, at which she noted Weyland experienced "[n]o pain, discoloration or decreased sensation" in the legs and feet. (Tr. 716.)

On January 16, 2018, nurse practitioner Xaia Yang noted Weyland reports "some numbness in her feet but has some good days and some bad days." (Tr. 772-73.) Weyland also "denies new or unusual back pain or other joint pain." (Tr. 773.) On physical exam Yang found "symmetrical musculature, no edema, no gross joint swelling or deformity." (Tr. 775.) Weyland's "deep tendon reflexes are normal and symmetric in the upper and lower extremities. Gait and station are normal, no gross motor or sensory deficits." (Tr. 775.) This is the exact wording of Dr. Rohloff's March 2017 exam. (Tr. 793.) Yang also noted Weyland's foot exam "improved from prior exam." (Tr. 775.)

These medical findings are a mixed bag, containing both normal and abnormal findings. Because the ALJ did not discuss the medical exam evidence on which he relied--that is, because he failed to build an accurate and logical bridge between the evidence and his conclusion that Weyland has "generally normal musculoskeletal and neurological findings," *see Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000)--the court cannot conclude that the ALJ's statement that the exam findings were generally normal is supported by substantial evidence.

Therefore, remand is necessary so the ALJ can clearly articulate how he evaluated the exam findings to determine the extent to which they are consistent or inconsistent with Weyland's allegations about her ability to perform work related activities.

### 4.1.3. Daily Activities

Weyland also argues that the ALJ erred in finding that her daily activities suggest she could work. (ECF No. 13 at 12-14.) The Commissioner argues that the ALJ permissibly found that Weyland's daily activities only "suggested" she could do light work. (ECF No. 15 at 9.)

The ALJ stated:

> [t]hose activities suggest physical abilities—such as lifting or carrying groceries, sitting for extended periods while driving, standing or walking for extended periods while shopping or at her part-time job, and generally exerting herself on a sustained basis—that are inconsistent with the alleged limiting effects of her symptoms and that suggested that she could still perform a limited range of light work[.]

(Tr. 22.)

While an ALJ must consider a claimant's daily activities in evaluating how her symptoms may limit her ability to work, 20 C.F.R. § 404.1529(c)(3)(i), household chores and work activities are not necessarily interchangeable. *See Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (finding that the ALJ's "casual equating of household work to work in the labor market cannot stand"). The Seventh Circuit has cautioned ALJs against placing undue weight on a claimant's household activities in assessing her ability to hold a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). In stating that Weyland's ability to do household chores "suggests that she could still perform a limited range of light work[,]" the ALJ erred by failing to explain how Weyland's ability to perform certain daily

activities suggested her ability to work full time. (Tr. 22.) The reported activities the ALJ relied on (e.g., grocery shopping) are consistent with Weyland's testimony "that she could only lift up to 15 pounds when having a 'good day,' only sit about four hours throughout a workday, and only stand about an hour at one time." (Tr. 21.)

The ALJ also inferred that Weyland could work full time from her ability to work part time. (Tr. 22) ("[Weyland] reported that she had worked part-time since her amended alleged onset date… Those activities suggest physical abilities--such as… at her part-time job… that are inconsistent with the alleged limiting effects of her symptoms and that suggested that she could still perform a limited range of light work.")  But the Seventh Circuit has stated, "[w]e have cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment." *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017). Without elaboration, it was impermissible to infer from Weyland's ability to work part time that she could work full time.

Therefore, remand is necessary for the ALJ to explain how Weyland's ability to engage in certain daily activities and to work part-time is inconsistent with the alleged limiting effects of her symptoms and suggest that she can perform a range of light work.

### 4.1.4. Allegedly Conservative Treatment

Weyland also argues that the ALJ erred by "playing doctor" in characterizing her treatment as "limited" and "conservative." (ECF No. 13 at 16.) The ALJ stated, "it was noteworthy that the claimant has not required long-term narcotic pain management, a

cane or other ambulatory device, or other types of conservative or more aggressive treatment. Her limited treatment further suggested that the effects of her diabetic neuropathy, fibromyalgia, and obesity were relatively mild." (Tr. 17.) He also stated that "[Weyland's] treatment was relatively limited since it primarily consisted of medication management with other conservative measures." (Tr. 21.) The ALJ did not cite medical evidence that other more aggressive forms of treatment were available to Weyland.

The Seventh Circuit Court of Appeals has held that an ALJ impermissibly "played doctor" when he "decided, absent any medical evidence, that [the claimant]'s condition was less serious because it was treated only with oral medication and not with insulin therapy." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). The Court of Appeals for the Seventh Circuit further found that "[t]he inference that it was not prescribed because [the claimant] was not experiencing significant problems appears to be the ALJ's own inference, and is wholly unsupported by the record." *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009).

While some may disagree whether insulin (injection and pump), pain medication (Gabapentin and Duloxetine), blood sugar monitoring, dietary restrictions, and exercise recommendations can be characterized as "conservative," *see Cunningham v. Colvin*, No. 14-C-420, 2014 U.S. Dist. LEXIS 164005, at *21 (E.D. Wis. Nov. 24, 2014) (citing cases), the error here is not merely semantic. (Tr. 16-17.) In characterizing the treatment as conservative, the implication was that, if Weyland's impairments were as bad as she

alleged, she would have received treatment that was more aggressive than insulin, pain medication, blood sugar monitoring, dietary restrictions, and exercise. However, the ALJ did not point to any medical evidence suggesting that more aggressive treatment might be appropriate for a person with Weyland's alleged subjective symptoms. *See Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009) (finding that, in the absence of medical evidence explaining why the claimant had not been prescribed insulin, the ALJ erred in suggesting that the absence of an insulin prescription demonstrated that the claimant's diabetes was not severe). The inference that "long-term narcotic pain management, a cane or other ambulatory device, or other types of conservative or more aggressive treatment" were not proscribed because Weyland was not experiencing significant problems appears to be the ALJ's own inference. (Tr. 17.) It is not a permissible lay observation, especially because "lay intuition about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

Therefore, remand is required for the ALJ to reassess the severity of Weyland's symptoms in accordance with SSR 16-3p, including assessing her treatment based on the medical expert opinions.

### 4.1.5.  Noncompliance with Treatment

Weyland also argues that the ALJ failed to consider the possible reasons in the record for her noncompliance with treatment--namely, poverty and pain. (ECF No. 13 at 19-20; Tr. 16, 720.) She also argues that the ALJ overstated the degree of noncompliance,

overstated the degree of improvement with compliance, and failed to acknowledge causes other than noncompliance that aggravate her diabetes. (ECF No. 13 at 19-21.)

In response, the Commissioner argues that Weyland has not provided "any sound explanation why she stopped complying with effective treatment by May 2017." (ECF No. 16 at 15.) However, the Commissioner supports that argument with record citations that also state that "even a 45-dollar co-pay is too much for her for the medication." (Tr. 779.)

The ALJ stated:

> it was remarkable that the effectiveness of the claimant's diabetes mellitus treatment was undermined by her repeated noncompliance with treatment. She repeatedly reported that she was not consistently taking her insulin, monitoring her blood sugar, and adhering to her dietary restrictions. Her treatment notes showed that the claimant's noncompliance with treatment was a contributing factor to her diabetes mellitus being poorly controlled or uncontrolled. It was also noteworthy that when her A1C improved in late 2016, it was attributed directly to her improved [sic] with compliance with treatment.

(Tr. 16) (internal citations omitted). Further, "[i]t was remarkable that her diabetes mellitus was responsive to that course of treatment when she was compliant with it, but that its effectiveness was undermined by her repeated noncompliance with taking her insulin, monitoring her blood sugar, and adhering to her dietary restrictions." (Tr. 21.)

"Courts have repeatedly stressed that an ALJ 'must not draw any inferences about a claimant's condition from this failure [to pursue treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care.'" *Eula M. v. Berryhill*, No. 17 C

6669, 2019 U.S. Dist. LEXIS 84685, *29 (N.D. Ill. May 20, 2019) (quoting *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)); *see* SSR 16-3p, 2016 SSR LEXIS 4, *23, 2017 WL 5180304, at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints."). The ALJ committed an error of law by inferring that Weyland's symptoms "were relatively mild" without exploring her explanations for not complying with her prescribed treatment. (Tr. 21.)

In sum, the ALJ determined that Weyland's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the record. The ALJ committed an error of law by not complying with the requirements of SSR 16-3p when he incorrectly stated the symptom evaluation standard, failed to consider the context of her daily activities, "played doctor" when he determined her treatment was conservative, and failed to consider Weyland's alleged reasons for non-compliance with treatment. The ALJ's determination that Weyland's exam findings do not support the alleged severity of her subjective symptoms is not supported by substantial evidence. On remand, the ALJ shall reevaluate the intensity, persistence, and limiting effects of Weyland's symptoms.

### 4.2. Opinion Evidence

Weyland also challenges the "little weight" the ALJ afforded the opinions of Michelle Holmes, M.D., Melanie Rohloff, M.D., and Roxanne Radich, APNP. (ECF No. 13 at 22-28.) The ALJ found their opinions "conclusory" and "unsupported and inconsistent" with the "medical record." (Tr. 23.)

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (unpublished) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)).

While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (unpublished)).

### 4.2.1.  Dr. Holmes

The ALJ gave little weight to the state agency opinion of Dr. Holmes stating that Weyland "could only stand or walk two hours in an eight-hour workday," explaining he made this determination

> for the reasons [he] gave only partial weight to Dr. Barnes's opinion [that Weyland's "statements and medical record… suggested that she required, more restrictive exertional and manipulative limitations"] and because her additional conclusion that [Weyland] could only stand or walk two hours was unsupported and inconsistent with her generally normal musculoskeletal and neurological findings.

(Tr. 23.) Weyland argues that the ALJ erred by relying on his own discussion of the exam findings and by failing to credit the broader scope of the records Dr. Holmes reviewed as opposed to the narrower scope of the records Dr. Barnes reviewed. (ECF No. 13 at 22-24; Tr. 23.)

As discussed above, there is no logical bridge between the medical evidence cited and the ALJ's determination that the medical records show the "generally normal musculoskeletal and neurological findings." (*infra* 4.1.2.) The ALJ's decision to give Dr. Holmes' opinion less weight than Dr. Barnes's opinion relies on that unsupported assessment of the medical record. Therefore, the ALJ erred in failing to give a sufficient reason for discounting Dr. Holmes's opinion.

Case 1:19-cv-01531-WED   Filed 10/02/20   Page 21 of 26   Document 18

### 4.2.2. Dr. Rohloff

Dr. Rohloff stated that Weyland

> has chronic medical conditions that make it unsafe for her to work in her current employment. She specifically has uncontrolled type I diabetes mellitus with a history of multiple hospitalizations for diabetic ketoacidosis and recurrent hypoglycemia despite insulin pump treatment, decreased sensation of extremities due to diabetic neuropathy, and fibromyalgia.

(Tr. 440.) She opined that Weyland "'should be considered a candidate for disability' due to her 'chronic medical conditions that make it unsafe for her to work in her current employment.'" (Tr. 440.) The ALJ give "little weight" to Dr. Rohloff's opinion because it "failed to address [Weyland's] function-by-function capacity," and was a "conclusory" "finding reserved to the commissioner[.]" (Tr. 23.)

Weyland argues that the ALJ must consider "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561. (ECF No. 13 at 22-24.) The Commissioner argues that Dr. Rohloff's statement was not a medical source opinion because "it was a conclusory statement on [Weyland's] ability to work[…] it thus does not get controlling weight or the special significance afforded to medical opinions[.]" (ECF No. 16 at 17.) Weyland replies that the Commissioner violates the *Chenery* doctrine because the ALJ considered Dr. Rohloff's opinion a treating source opinion. (ECF No. 17 at 12.)

The ALJ considered Dr. Rohloff's opinion a treating source opinion. (Tr. 23) ("I considered treating source opinions as well. [Weyland's] primary care provider, Melanie J. Rohloff, M.D., prepared an opinion in August 2016.") For the Commissioner to now attempt to defend the ALJ's decision by pointing to reasons not offered by the ALJ offends the *Chenery* rule. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S. Ct. 454, 87 L. Ed. 626 (1943)).

As discussed above, the ALJ's opinion that the medical record reflects "generally normal musculoskeletal and neurological findings" is unsupported. Dr. Rohloff's opinion is not inconsistent with the record on that basis.

The ALJ also discounted Dr. Rohloff's opinion because it was conclusory. (Tr. 23.) The ALJ noted that Dr. Rohloff's opinion contained scant support for the conclusion. (Tr. 23); 20 C.F.R. 404.1527(c)(3). The court finds that the ALJ has sufficiently explained his reasoning for discounting Dr. Rohloff's opinion—the opinion "failed to address [Weyland's] retained function-by-function abilities, which greatly limited its probative value." (Tr. 23.) The ALJ gave an example of why it found Dr. Rohloff's opinion conclusory, not leaving Weyland to wonder to what the ALJ was referring. The ALJ's failure to consider support for Dr. Rohloff's opinion outside the records was not "patently erroneous."

### 4.2.3. Nurse Practitioner Radich

The ALJ also gave little weight to Nurse Practioner Radich's opinions "because they were inconsistent her [sic] own generally normal musculoskeletal and neurological findings from examining [Weyland] and the generally normal findings throughout the longitudinal medical record." (Tr. 23.)

Weyland argues that the ALJ erred by discounting Radich's opinion because it conflicted with his own view of the medical record. (ECF No. 17 at 12-14.) The Commissioner argues that Radich is a "non-acceptable medical source" or "other source." (ECF No. 15 at 19.) Weyland replies that the Commissioner's argument violates *Chenery* by offering different reasoning than that supplied by the ALJ. (ECF No. 17 at 12-13.)

It is not clear what the ALJ refers to when he says Radich's opinion is "inconsistent her [sic] own generally normal musculoskeletal and neurological findings from examining [Weyland]." The ALJ likely refers to the bare foot exams. (*e.g.,* Tr. 712) ("On bare foot exam, patient was able to detect a 10-gram monofilament 6 out of 6 times bilaterally. Patient does have hair of the dorsum on her feet, skin is intact, pulses are 2+. There is no ankle edema. Vibratory sense with a 128 Hz tuning fork on the hallux of the great toe is 16 seconds.") But neither the court nor the ALJ have the medical expertise to conclude the technical exam findings were normal based on the data provided. The ALJ erred in failing to give sufficient reasons for discounting Radich's opinion.

Case 1:19-cv-01531-WED   Filed 10/02/20   Page 24 of 26   Document 18

### 4.3. RFC Assessment

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). "The reason for [this] rule is to ensure that the [VE] does not refer to jobs the [claimant] cannot work because the [VE] did not know the full range of the [claimant's] limitations." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

Weyland argues that the ALJ erred by not including in his RFC assessment or in the hypotheticals to the VE a limitation on standing or walking. (ECF No. 13 at 30; ECF No. 15 at 14-15.) She argues that Michelle Holmes, M.D., opined that Weyland had a limitation to two hours of standing or walking in an eight-hour day. (ECF No. 15 at 14-15.) In response, the Commissioner argues that the ALJ reasonably gave more weight to Dr. Barnes's opinion that Weyland could walk for up to six hours per workday. (ECF No. 15 at 21.) The ALJ weighed Dr. Barnes's opinion more heavily than Dr. Holmes's opinion because the standing and walking restriction was "unsupported and inconsistent with her generally normal musculoskeletal and neurological findings." (Tr. 23.)

As discussed above, the ALJ impermissibly relied on his own reading of the medical evidence to reach that conclusion. The ALJ cannot rely on that unsupported conclusion to weigh the medical opinions for the RFC. The ALJ erred by relying on an incorrect premise to weigh the medical opinions in assessing the RFC.

## 5. Conclusion

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of October, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge